**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH E. HUDAK,      )
                        )
        Plaintiff,     )     Civil Action No. 06-104 Erie
                        )
     v.                )
                        )
TIMES PUBLISHING COMPANY,  )
INC., et al.,              )
                        )
        Defendants.   )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District J.,

     This civil action involves allegations by the Plaintiff, Joseph E. Hudak, that Defendants, Times News Publishing Company, Inc., t/d/b/a/ Erie Times-News (hereinafter the "Times") and two of its employees, reporter Lisa Thompson and editor Pat Howard, defamed him in connection with five separate stories that the Times ran in 2005 and 2006.  Plaintiff, formerly a practicing attorney, became the subject of contempt proceedings in 2002 and 2003 before two different judges of the courts of common pleas in Pittsburgh and Erie.  Shortly thereafter, Plaintiff became the subject of disciplinary proceedings before the Pennsylvania Supreme Court, which culminated in the suspension of his license for a period of time.  Then, in 2005, the Erie County District Attorney's Office charged Plaintiff in five separate criminal cases with theft by unlawful taking in connection with his handling of five different client matters.  Each of the criminal cases ended favorably for Plaintiff and, thereafter, Plaintiff sued the Erie County District Attorney for alleged violations of his civil rights stemming from the criminal prosecutions.  In covering Plaintiff's criminal proceedings and the ensuing civil rights litigation, the Times referenced or alluded to all of the foregoing events.

     After filing for relief under Chapter 11 of the Bankruptcy Code, Plaintiff commenced this adversary proceeding against the Defendants in the Bankruptcy Court

on March 27, 2006, asserting a single count of defamation under Pennsylvania law.[1]

Reference of the matter was subsequently withdrawn to this Court.  Defendants have

now moved for summary judgment as to all aspects of the defamation claim.  This

Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1334(b).

# I.  BACKGROUND[2]

*The Contempt Proceedings Before Judge Cashman*

Plaintiff is a lawyer who formerly concentrated his practice in the area of criminal

defense matters.  In May of 2002, Plaintiff was scheduled to defend a criminal case

before the Honorable David Cashman of the Allegheny Court of Common Pleas.  When

he failed to appear for the scheduled trial date, he became the subject of a criminal

contempt judgment and was sentenced to serve six months in jail.  The Superior Court,

which later vacated the judgment, recounted the relevant events as follows:

> 1.      A trial of Hudak's in Allegheny County started on May 13, 2002
> and, although it was expected to conclude on May 15, lasted until May 16.
>
> 2.      A trial of Hudak's in Erie was scheduled for May 16 and was rolled
> over until Friday, May 17.  Although expected to conclude on May 17, the
> jury in the Erie case did not reach a verdict until May 20.

---

[1] At the time this complaint was filed, only two of the five challenged articles had
been published by the Times.  Discovery subsequently revealed that Plaintiff sought to
challenge three additional articles which had been published by the Times in the
interim.  Though the complaint sets forth only a single claim of defamation, the parties
have treated that claim as encompassing Plaintiff's challenge to the five articles
discussed herein.  We will do so as well.

[2] In reviewing the pending motion, we apply the well-established standards which
pertain when relief is requested under Rule 56 of the Federal Rules of Civil Procedure.
Summary judgment is proper only if it appears "that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); *Carrasca v. Pomeroy*, 313 F.3d 828, 832-33 (3d Cir.2002).  When
considering the facts, we view the evidence of record in the light most favorable to the
nonmoving party and draw all reasonable inferences in his favor.  *Andreoli v. Gates*,
482 F.3d 641, 647 (3d Cir.2007) (citation omitted).  Accordingly, to the extent the
following facts are genuinely disputed, we adopt the version most favorable to Plaintiff.

3.     The instant case had been scheduled for May 20 before the Honorable David R. Cashman in Allegheny County. It was not until the Erie jury carried over that Hudak could have known that he would be unavailable in Allegheny County on May 20. Because Hudak was in Erie, he sent a person from his staff over to request a continuance, particularly since he did not expect the victim to appear, because the victim had repeatedly failed to appear in the past. Therefore, it was thought the likely result would be a *nolle prosse* or a Commonwealth continuance. However, rather than a normal continuance, the case was rolled over to Wednesday, May 22.

4.     At this point, Hudak realized that he had been previously attached for a death penalty, double homicide case before Judge John Poserina in Philadelphia. As appropriate, Hudak contacted Judge Poserina so Judge Poserina and Judge Cashman could resolve the conflict without "middling" the attorney. Judge Poserina, in light of his attachment of Hudak, contacted Judge Cashman. However, Judge Cashman did not relieve Hudak of the obligation to appear on May 22 – a date that had been set only two days earlier – and Judge Poserina refused to release Hudak.

5.     On May 22, Hudak arranged to have an attorney present before Judge Cashman, the trial judge in the instant case, in the event the complaining witness did not appear again, so that this lawyer could request a *nolle prosse*. However, the witness did appear, and the other lawyer was not prepared to go to trial on the case.

*Commonwealth v. Hudak*, No. 963 WDA 2002 (Pa. Super. June 22, 2004) at pp. 2-3 [25-9].

Based on these facts, the Superior Court ruled that the record could not support the judgment of criminal contempt. The court found that Plaintiff's failure to appear before Judge Cashman was "the result of a busy criminal lawyer getting caught in the switches of various courts' calendars, not a conscious decision to disregard the trial judge's order." *Id*. at p. 2. While the court stressed that it did not condone Plaintiff's conduct in failing to properly manage his caseload, it found no evidence of any deliberate contempt on Plaintiff's part relative to the order to try the Allegheny County case. The court concluded that Judge Cashman had abused his discretion in finding Plaintiff disobedient or neglectful beyond a reasonable doubt and it therefore vacated the judgment of sentence.

*The Contempt Proceedings Before Judge Cunningham*

In 2003, Plaintiff became the subject of contempt proceedings before the Honorable William R. Cunningham, then President Judge of the Erie County Court of Common Pleas. Those proceedings grew out of Plaintiff's failure to appear at a hearing that had been scheduled for May 30, 2003 before Judge Cunningham. While the events giving rise to the contempt proceedings are somewhat in dispute, the following facts, at least, appear to be uncontested.[3]

In late May of 2003, Phyllis Case spoke to someone in Plaintiff's Erie office about retaining Plaintiff to represent her son, Eugene Case, who was then in jail on a probation detainer. (R&R [25-11] at ¶ 119.) On May 21, Mrs. Case executed a Power of Attorney and Fee Agreement, pursuant to which: (i) Plaintiff agreed to file a Motion for Release and/or House Arrest on behalf of Eugene, (ii) it was agreed that Plaintiff's legal fee was a non-refundable retainer; (iii) Mrs. Case's initial payment of $400 was acknowledged; and (iv) it was agreed that additional defense in the matter would cost $750. (*Id*. at ¶ 120.) Mr. Case was scheduled to appear at a probation/parole revocation hearing before Judge Cunningham on May 30. On May 29, Mrs. Case deposited an additional $500 payment with a staff member in Plaintiff's Erie office to cover the cost of Plaintiff's appearance at the hearing the following day. (*Id*. at ¶¶ 123-124.)

Meanwhile, Plaintiff had been scheduled to attend several other hearings in Pittsburgh on May 30. On the afternoon of May 29, after Mrs. Case had made an additional $500 payment, someone from Plaintiff's Erie office contacted Judge Cunningham's chambers to request a continuance of the May 30 hearing, but the request was denied. (*See* Petition for Writ of Prohibition To Honorable William R.

---

[3] These facts are gleaned from the "Findings of Fact" (Part II) of the Report and Recommendation of the Supreme Court's Disciplinary Board, filed on October 25, 2004, pp. 19-22. The Report and Recommendation is a matter of public record and is docketed in this case at No. 25-11. References to these factual findings are designated herein as ("R&R" [25-11] at ¶ ___.) To the extent these findings might be contested, we set forth Plaintiff's version of events, *infra*.

Cunningham, Court of Common Pleas of Erie County, Pennsylvania [25-15] at ¶ 10.) Plaintiff then attempted unsuccessfully to obtain substitute counsel for Mr. Case. (*Id*.) Unable to resolve his scheduling conflict, Plaintiff did not attend the May 30 hearing before Judge Cunningham. (R&R at ¶ 125.)

On June 26, 2003 while in the Erie County Courthouse on another matter, Plaintiff was served with a bench warrant issued by Judge Cunningham and a notice to appear at 4:00 p.m. that day for a contempt hearing. (R&R at ¶ 128.) A hearing was held that afternoon and, by order dated June 27, 2003, Plaintiff was found to be in contempt for his failure to appear for Mr. Case's May 30 revocation hearing. (*Id*. at ¶ 130.) As part of the contempt judgment, Plaintiff was ordered to pay a $500 fine and issue a written letter of apology to Eugene Case and his mother. (*Id*. at ¶ 131.) Plaintiff was further ordered to refund $900 to Mrs. Case within 24 hours in the event her son no longer wished to retain Plaintiff. (*Id*. at ¶132.) Plaintiff ultimately paid the $500 fine and did not appeal the contempt ruling. (*Id*. at ¶ 133.)

By certified letter of October 23, 2003, Mrs. Case demanded a refund of her monies. (*Id*. at ¶ 137.) Though Plaintiff later admitted receiving this letter, it was his opinion that only the client, Eugene Case, could fire him, so Plaintiff did not reply to the letter or refund any money to Mrs. Case. (*Id*. at ¶¶ 138-139.)


*The Disciplinary Proceedings*

In the wake of these events, Plaintiff became the subject of disciplinary proceedings before the Pennsylvania Supreme Court. These proceedings were apparently sparked by a letter and affidavit submitted by Judge Cunningham to the Office of Disciplinary Counsel (ODC) in which Judge Cunningham outlined his concerns about Plaintiff's performance with respect to several different client matters and requested that immediate disciplinary action be taken against Plaintiff. (*See* Petition for Writ of Prohibition [25-15] at ¶¶ 11, 14-15, 17.) In his letter and accompanying affidavit, Judge Cunningham intimated that Plaintiff had engaged in criminal activity relative to

5

his representation of Eugene Case.[4] (*Id.* at ¶ 14.) He also asserted that Plaintiff had appeared under the influence of alcohol in one court proceeding[5] and that, in another matter, Plaintiff had failed to file a Superior Court brief on behalf of a client named Mark Pollard, resulting in the dismissal of Mr. Pollard's appeal from a criminal sentence. (*Id.* at ¶¶ 15, 17.)[6]

These communications from Judge Cunningham, which Plaintiff characterizes as

---

[4] Plaintiff contests the accuracy of Judge Cunningham's averments relative to the events leading up to his contempt judgment in the *Case* matter. For present purposes, however, those disputes are not material. With respect to the alleged criminality of Plaintiff's conduct relative to the *Case* matter, the record reflects that Plaintiff was ultimately cleared of any criminal wrongdoing, as we discuss *infra*.

[5] This averment relates to Plaintiff's representation of an individual by the name of Frederick Dean. Judge Cunningham's affidavit asserted that:

> [o]n May 19, 2003, Attorney Hudak appeared before the Honorable Shad Connelly in Erie County under the influence of alcohol for a criminal jury trial. He was administered a PBT. Attorney Hudak attributed the alcohol reading to the use of mouthwash. This case is Commonwealth v. Frederick Dean, Erie County Docket No. 1609 of 2002.

(*See* Pet. for a Writ of Prohibition [25-15] at ¶ 15.)

Plaintiff disputes the assertion that he was under the influence of alcohol at the time of Mr. Dean's trial. In support, he relies on a letter that Judge Connelly, the presiding trial judge, authored relative to the *Dean* matter. In pertinent part, Judge Connelly wrote, "A representative of the Disciplinary Board called me several weeks ago concerning Judge Cunningham's affidavit and I informed him it was inaccurate, that you were not under the influence, that you conducted yourself in a professional manner, and that you won an acquittal for your client." (*See* Pet. for Writ of Prohibition at ¶ 16.) Though Plaintiff challenges Judge Cunningham's suggestion of misconduct in the *Dean* case, this dispute is not material to our resolution of the instant summary judgment motion.

[6] Plaintiff contests the accuracy of this assertion. Though the Superior Court's official docket reflects that the case was finally dismissed due to the failure to file a brief, *see Commonwealth v. Mark Pollard*, 1760 WDA 2002, Plaintiff has maintained that the appeal was effectively waived by Mr. Pollard himself due to Pollard's own failure to file a statement of matters being raised on appeal. This dispute is not material for present purposes.

inaccurate and misleading, evidently served as the primary basis for the ODC's petition for an emergency temporary suspension of Plaintiff's license to practice law. (*Id.* at ¶ 12.) On October 3, 2003, the Pennsylvania Supreme Court issued an order which, among other things, effected an immediate temporary suspension of Plaintiff's license,[7] directed that the ODC file a Petition for Discipline within thirty days, and designated the case for accelerated disposition. *See Office of Disciplinary Counsel v. Hudak*, 839 A.2d 170 (Pa. Oct. 3, 2003).

Two separate Petitions for Discipline were filed by the ODC in November of 2003 and were subsequently joined. Hearings took place before a three-member hearing committee over the course of five days in December of 2003 and January of 2004. Following these hearings, the committee issued a report dated April 30, 2004, in which it found that Plaintiff had violated certain rules of professional conduct and recommended that his license to practice law be suspended for a period of two years. Plaintiff filed exceptions to the report, and oral argument was held before a three-member panel of the Disciplinary Board on July 12, 2004. The matter was later adjudicated by the full Board at its July 17, 2004 meeting. (*See* Report and Recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania (hereinafter, "R&R") [25-11] at Part I "History of Proceedings.")

On October 25, 2004, the Disciplinary Board issued its Report and Recommendation to the Pennsylvania Supreme Court. (*See* R&R [25-11].) As the

---

[7] By *per curiam* order dated February 18, 2004, the Supreme Court dissolved its previous Order of Temporary Suspension, stating:

> As the Petition for Discipline filed on November 3, 2003, does not include the allegations upon which this Court relied in entering the October 3, 2003 Order of Temporary Suspension said Order is hereby dissolved, without prejudice to any pending or future disciplinary proceedings, and respondent is reinstated to the practice of law, effective immediately.

*See Office of Disciplinary Counsel v. Hudak*, 847 A.2d 656 (Pa. Feb. 18, 2004).

Board described it, "[t]he issue at the heart of [the] matter" was Plaintiff's "use of non-refundable retainer fee agreements." (R&R [25-11] at Part IV, "Discussion," p. 27.) The ODC had alleged that Plaintiff had engaged in a course of conduct whereby, after having his clients sign such agreements, he then failed to provide legal services on his clients' behalf. When refunds were requested by his clients, the ODC claimed, Plaintiff had declined to refund any monies, taking the position that, per the agreements, the clients had no right to a refund of their payments. The ODC had charged that these practices violated Rule 1.16(d) of the Rules of Professional Conduct.[8]

The Disciplinary Board concluded that neither Rule 1.16(d) nor Pennsylvania law prohibit flat-fee arrangements of the kind utilized by Plaintiff; rather, the law only prohibits flat fees that are illegal or clearly excessive. The Board concluded that Plaintiff did not violate Rule 1.16(d) in relation to six of his clients' matters; however, it noted Plaintiff's admission that he should have refunded monies in two other client matters, one of which involved Eugene Case. (*See* R&R, Part IV, "Discussion," at pp. 27-29.)

The Disciplinary Board went on to conclude that Plaintiff had committed professional misconduct in other respects, *e.g.,* by not acting with diligence or promptness in handling his clients' matters, by failing to appear at scheduled court proceedings, by not returning phone calls or otherwise communicating with his clients, and by failing to keep his clients informed as to the status of their matters. (R&R, Part IV, "Discussion" at pp. 29-30.) "This case," the Board wrote, "presents a disturbing pattern of dereliction by a lawyer seemingly overburdened by his case load." Ultimately,

---

[8] Rule 1.16(d) provides, in relevant part:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect the client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned.

the Board found that Plaintiff had violated several different rules of professional conduct in connection with his representation of eight different clients. (R&R [25-11] at Part III, "Conclusions of Law," ¶¶ 1-21.) It recommended that Plaintiff be suspended from the practice of law for a period of two years with credit for the time he previously served in connection with the temporary suspension of his license. (R&R at Part V, "Recommendation," p. 33.)

On March 1, 2005, the Pennsylvania Supreme Court issued an order denying further review of the matter, refusing oral argument, and suspending Plaintiff from the Pennsylvania bar for a period of one year and one day, with credit for four and one-half months previously served. *See Office of Disciplinary Counsel v. Hudak*, 868 A.2d 1195 (Pa. March 1, 2005).

*The Criminal Proceedings*

On March 16, 2005, five criminal complaints were filed against Plaintiff in Erie County. Each of the criminal complaints charged Plaintiff with the crime of "theft by unlawful taking or disposition"[9] in connection with his handling of clients' fees. In each case, the theft charge was based on the allegation that Plaintiff, after accepting payment of a retainer or fee, did not perform the legal services for which he had been hired and did not refund the client's money when asked to do so. The five cases stemmed from Plaintiff's representation of the following individuals: Eugene Case, Mark Pollard, Joanne Catron, David O'Connell, and Kelly Makela.

Ultimately, each of the criminal cases was disposed of favorably to Plaintiff. The charge concerning Plaintiff's representation of Kelly Makela was *nolle prossed* by the District Attorney's office prior to trial, while the charge stemming from Plaintiff's

---

[9] *See* 18 P.S. 3921(a) ("**Movable property .**--A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.")

representation of Joanne Catron resulted in Plaintiff's acquittal after a jury trial.[10]  As to

the remaining three cases, they were dismissed in the Court of Common Pleas after

Judge Bozza granted Plaintiff's motions for habeas corpus relief.  The basis for those

dismissals was explained in one opinion as follows:

> Accepting as true the testimony presented at the preliminary hearing on each of the cases at issue, the Commonwealth failed to meet its probable cause burden.  In each instance, the evidence was only sufficient to establish that the defendant may have violated the terms of his contracts with his clients.  The Commonwealth's evidence indicated that when Mr. Hudak or his agent received money from each client he agreed to perform certain, albeit important, legal services.  Although he failed to perform those services as promised, there was no evidence nor does the Commonwealth maintain that he took the money deceptively or without the intent to do what he promised.  In such circumstances title to the funds passed to Mr. Hudak and he lawfully possessed the money. ... It has been firmly established in the Commonwealth that there can be no "conversion" in these circumstances unless title has not passed or the defendant is not otherwise in lawful possession of the property. ... Therefore, the Commonwealth failed to establish probable cause to believe that the defendant *unlawfully* took or exercised control over the property *of another*.

*Commonwealth v. Hudak*, Nos. 1398 & 1400 of 2005, 89 Erie 168, 171 (Pa. Com. Pl.

July 14, 2006) (internal citations omitted) (emphasis in the original) (included in the

record at Def.s' Append. to Mot. for Summ. Judg., Ex. 12 [25-14]).  The Commonwealth

appealed each of the three dismissals and, on February 15, 2007, the Superior Court

affirmed Judge Bozza's rulings.


*The Federal Civil Rights Litigation*

Meanwhile, Plaintiff was experiencing financial difficulties and filed for

bankruptcy protection on January 3, 2005.  On March 27, 2006, the same day that the

instant litigation was commenced, Plaintiff initiated an adversary proceeding in the

Bankruptcy Court against Brad Foulk, the District Attorney of Erie County.  The

complaint, as amended, alleged that Foulk had violated Plaintiff's Fourth Amendment

---

[10] That case also involved a charge of forgery, which was *nolle prossed* by the Commonwealth prior to trial.

rights in connection with Plaintiff's arrest and prosecution on theft charges.  On December 5, 2007, this Court entered a summary judgment in favor of Foulk in the civil rights litigation.

## II.  DISCUSSION

Plaintiff's sole cause of action against the Times is a claim for defamation under Pennsylvania law.  Though styled as a single cause of action in his complaint, Plaintiff's defamation claim targets five stories run by the Times on March 26 of 2005 and February 7, April 14, July 6, and July 11 of 2006.  During argument on the pending summary judgment motion, it became clear that the statements presently in dispute have been narrowed[11] to three principal subjects:  (i) the Times' use of the terms "theft" and "stealing" in reporting on the criminal cases; (ii) the Times' reprinting of a comment made by Foulk relative to the criminal charges filed against Plaintiff; and (iii) the Times' treatment of Judge Bozza's rulings whereby several of the criminal charges were dismissed.

In an action for defamation, it is the plaintiff's burden to prove, when the issue is properly raised:  (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.  42 Pa. C.S.A.

---

[11] Plaintiff originally challenged the photo caption accompanying the Times' March 26, 2005 news article ("Lawyer faces theft charges") that was published on GoErie.com.  It is undisputed on this record that none of the named Defendants had any involvement in the publication of the challenged photo caption, and GoErie.com is not owned by the Times.  Rather, GoErie.com is a fictitious name of the limited partnership CyberInk, L.P., whose general partner is CyberInk, Inc.  (*See* Affidavit of Henry Bujalski, Def.s' Append. at Ex. 16 [25-20].)  Accordingly, Plaintiff agrees that the Times cannot be liable for any allegedly defamatory statements appearing in the challenged photo caption.

§ 8343(a).  It is the defendant's burden to prove, when the issue is properly raised:  (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; and (3) the character of the subject matter of defamatory comment as of public concern.  *Id.* at § 8343(b).

Not all of these issues are in dispute in the present case.  Instead, Defendants have argued that they are entitled to summary judgment either because the challenged statements are not capable of defamatory meaning, or because they are conditionally protected by the fair report privilege, or because Plaintiff is a limited purpose public figure who cannot demonstrate that the challenged statements were made with malice.

A.

One component of Plaintiff's defamation claim concerns the Defendants' use of the terms "theft" and/or "stealing" in reference to Plaintiff's alleged misconduct. Plaintiff's theory seems to be as follows:  Defendants were in possession of the actual criminal complaints which laid out the factual allegations in support of the criminal charges; at some point, Defendants also came into possession of Plaintiff's own legal papers which argued that the alleged misconduct, even if true, did not constitute theft or any other crime under Pennsylvania law; despite being in possession of these materials, the Defendants continued to publish reports about the Plaintiff in which they "mis-characterize[d] the charges as 'stealing' and 'theft,' even though the [D]efendants knew that the allegations did not remotely constitute what is plainly understood to be stealing or theft."  (Pl.'s Br. in Opp. to Def.s' Mot. for Summ. Judg. [30] at p. 3.)  Plaintiff complains that the "Defendants repeatedly used the words 'stealing' and 'theft' in various contexts that carried a materially greater sting than a precisely accurate retelling."  (*Id.* at p. 2.)  Because the allegedly defamatory material appears in several different articles, we will discuss each one separately.

1.  The March 26, 2005 Article

In her March 26, 2005 story entitled "Lawyer faces theft charges," Defendant

Thompson commented on four of the criminal charges which had, at that time, just recently been filed against Plaintiff. For context, we quote the article in its entirety:

Kelly Makela thought the $4,750 she paid lawyer Joseph Hudak might buy her freedom.

It could earn Hudak a criminal record, instead.

The state Supreme Court twice suspended Hudak from practicing law, and judges in Erie and Allegheny counties have held him in contempt for failing to appear in court in recent years.

Now the Pittsburgh-based lawyer faces a new legal challenge – criminal charges.

Erie County Detective Jessica Lynn filed theft charges against Hudak, alleging he stole a total of $9,075 from four Erie County clients from whom he allegedly accepted money but to whom he did not provide services in return.

Erie County District Attorney Brad Foulk said the charges were filed only after efforts to collect the money from Hudak failed.

"Some folks clearly were not only defrauded of money, they were not provided adequate representation. That's a one-two punch on the whole system," he said.

Hudak turned himself in for arraignment before Erie 1st Ward District Judge Sue Mack. He was released on $2,500 unsecured bond.

A preliminary hearing is set for Friday in Erie County Central Court.

That is one day after Hudak's latest suspension by the state Supreme Court is slated to go into effect.

The state Supreme Court Disciplinary Board issued an order suspending Hudak for one year and one day on March 1. It said the order will go into effect in 30 days. Hudak will get credit for the four months' suspension he served between October 2003 and February 2004.

It is not known if the suspension is related to the alleged incidents in Erie.

Numbers for Hudak's Erie and Pittsburgh offices were no longer in service Friday.

Hudak faces four misdemeanor counts of theft by unlawful taking or disposition, and one felony count of the same charge. The grading in that charge was higher because of the amount he allegedly stole.

According to Lynn's criminal complaint, the accusers and their allegations are the following:

* Ann Rice. Hudak allegedly accepted $1,500 from this nearly 80-year-old Erie retiree, who hired him in May 2003 to file a post-trial appeal for her son, David O'Connell. O'Connell had been convicted in May 2002 of soliciting someone to kill a woman, and sentenced to six and a half to 13 years in

state prison.  Authorities say Hudak did not take any action on O'Connell's behalf.

* Phylliss Case.  She paid Hudak a total of $900 in May 2003 to file a motion to release her son, Eugene Case, or place him on house arrest, and then represent him in a revocation hearing in a DUI case.  No motion was filed, nor did Hudak or anyone from his law firm appear on Case's behalf, authorities charge.

* Kelly Makela.  She and her family paid Hudak $4,750 in August 2003 to represent Makela on assault charges stemming from an August 1995 fight near a tavern in the 300 block of East Fifth Street.  Makela had avoided prosecution for five years but was arrested on a fugitive-from-justice warrant in South Carolina in February 2003.

Makela told Judge William R. Cunningham in a November 2003 hearing that Hudak had told her she could enter a plea to a misdemeanor and go home in October 2003.  Instead, Makela wound up pleading no contest to a host of charges and being sentenced to 21 months to 10 years in state prison for firing shots into the air during an argument.

Prosecutors say Hudak filed an appearance to represent Makela and a motion for nominal bond, and nothing else.

* Mark Pollard.  He paid Hudak a total of $1,925 in 2002 and 2003 to file an appeal before the state Superior Court.  Hudak filed an appearance to represent Pollard and asked for several extensions to file a motion, authorities said.  Pollard's appeal was dismissed in June 2003 because Hudak did not file a brief.

The criminal complaints do not outline how these cases came to Foulk's attention.

In June 2003, Cunningham held Hudak in a courthouse holding cell for several hours, then cited him for contempt and fined him $500 for failing to appear in Case's case in May 2003.  Hudak blamed his failure to appear in Case's case on a scheduling conflict.  He also charged that he had not received notice for Cunningham's contempt hearing in May 2003.

Lynn said in the complaint that it appears Hudak might "not have the full funds needed to repay the victim."

(Def.'s Append. at Ex. 2 [25-3].)

Initially, it is the Plaintiff's burden of establishing that the challenged statement is capable of defamatory meaning.  To prove defamation, the plaintiff must show that the challenged statement "tends so to harm [his reputation] as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Blackwell v. Eskin*, 916 A.2d 1123, 1125 (Pa. Super. 2007) (quoting *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 124 (Pa. 2004)).  A communication is also defamatory if it ascribes to another conduct, character or a condition that would

adversely affect his fitness for the proper conduct of his proper business, trade or profession. *Maier v. Marelli*, 671 A.2d 701, 704 (Pa. Super. 1995), *appeal denied*, 694 A.2d 622 (Pa. 1996). Whether the challenged statements are capable of defamatory meaning is a question of law to be decided by the court. *Id*. (citing *Tucker*, *supra,* at 123).

"In determining whether a communication is defamatory, the court must view the statement 'in context' with an eye toward 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (quoting *Baker v. Lafayette College*, 532 A.2d 399, 402 (Pa. 1987)) (alteration in the original). Publications which serve merely to annoy or embarrass the subject are not sufficient to establish a claim for defamation. *Blackwell*, 916 A.2d at 1125 (quoting *Tucker*, *supra*); *Maier,* 671 A.2d at 704.

Here, Plaintiff has satisfied his initial burden of establishing that the challenged statement – i.e., that he had been accused of stealing or committing theft from his clients – is capable of defamatory meaning. "[I]t is well-settled law that a communication which ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his business, trade, or profession, is defamatory per se. ... Clearly, statements to the effect that an attorney has committed improper, illegal actions within the context of his practice would tend to impugn his integrity and thereby blacken his business reputation." *Pelagetti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987) (internal citations omitted). *See also Bochetto v. Gibson*, No. 03732 APRIL TERM 2000, Control 040111, 2006 WL 2126296 at * 3 (Pa. Com. Pl. July 27, 2006). However, Defendants contend that Plaintiff's claim must fail because the challenged statements are protected by the fair report privilege and/or because Plaintiff is a limited purpose public figure who cannot make the requisite showing that the alleged defamatory statements were made with malice.

We first address the issue of whether the challenged statements are protected

by what has been termed the "fair report privilege." The privilege is premised "upon the theory that it is in the public interest that information be made available as to what takes place in public affairs." *Sciandra v. Lynett*, 187 A.2d 586, 588 (Pa. 1963). It holds that a news source has a qualified privilege to make a fair and accurate report of official governmental reports or proceedings if the publication is not made solely for the purpose of causing harm to the subject of the report. *See Id.* at 588-89; *Tucker v. Philadelphia Daily News*, 757 A.2d 938, 946 (Pa. Super. 2000) (citing *Binder v. Triangle Publications, Inc.*, 275 A.2d 53, 56 (Pa. 1971)), *aff'd in part and rev'd in part on other grounds*, 848 A.2d 113 (Pa. 2004). *See also Oweida v. Tribune-Review Pub. Co.*, 599 A.2d 230, 233-34 (Pa. Super. 1991) ("[I]f the account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate.").

The privilege, however, is a qualified one, and may be overcome by a showing that the defendant overly embellished or made exaggerated additions to an account of a proceeding. Sciandra, 187 A.2d at 589; *Tucker*, 757 A.2d at 946 (citing *Binder*, 275 A.2d at 56). As one court describes it,

> [t]he question of whether the fair report privilege has been abused has been distilled ... to a "gist" or "sting" test. "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983). The question is whether a reasonable person, comparing the [subject matter of the official report or proceeding] and the article as a whole, could conclude that the article was a fair and accurate rendition of the [subject matter]. If the reader could conclude that the article carries with it a materially greater "sting," then the fair report privilege has been abused and is thus forfeited.

*First Lehigh Bank v. Cowen*, 700 A.2d 498, 503 (Pa. Super. 1997) (citing *Mosley v. Observer Pub. Co.*, 629 A.2d 965 (1993)). Notably, the fair report privilege does not require that a newspaper account contain a "verbatim recitation" of the subject matter being reported on; it simply requires that the account provide a "substantially accurate"

summary. *Tucker, supra*, at 946. 502. Thus, a defamation claim "cannot be premised solely on a newspaper's style or utilization of vivid words in reporting on a judicial proceeding." *Id*. (citing *Binder*, 275 A.2d at 58).

Application of the fair report privilege involves a shifting burden of proof. The plaintiff's *prima facie* burden is satisfied when he has established the publication of a defamatory news article. *Sciandra*, 187 A.2d at 589. Thereafter, the defendant bears the burden of establishing that "the occasion upon which the defendant published the defamatory matter gives rise to a privilege." *First Lehigh Bank,* 700 A.2d at 503. *See* 42 Pa. C.S.A. § 8343(b)(2). The issue as to whether or not publication of a challenged communication gives rise to a privileged "occasion" is one of law to be determined by the court. *First Lehigh Bank, supra*, at 503. Once the existence of a privileged occasion is established, the burden then shifts to the plaintiff to establish an abuse of that privilege. *Id*. *See* 42 Pa. C.S.A. § 8343(a)(7). Whether the privilege has been abused or overcome is a factual question for the jury, but like any other factual inquiry, it may be ruled on by the court "if the evidence is so clear that no reasonable person would determine the issue in any way but one." *First Lehigh Bank*, *supra*, at 503. *See also Sciandra,* 187 A.2d at 592 ("It is the duty of the court to declare as a matter of law that no abuse of the '[fair report] privilege' exists where the evidence adduced leads to but one conclusion.") (citations omitted). If the defendant fails to establish that the challenged communication gives rise to the privilege, or if the plaintiff succeeds in demonstrating that the privilege has been abused, then malice is inferred as a matter of law. *Sciandra*, 187 A.2d at 589.

Here, as we noted previously, Plaintiff has met his initial burden of establishing that the references in the March 26, 2005 article to Plaintiff having allegedly engaged in "theft" and/or "stealing" are capable of defamatory meaning. This therefore raises the question whether the publishing of these matters gives rise to an "occasion" for the conditional fair report privilege. We easily conclude that Defendants have met their burden on this issue. In running the March 26 story entitled "Lawyer faces theft

17

charges," the Times was reporting on the criminal charges that had recently been filed against Plaintiff. Judicial proceedings of this sort fall squarely within the ambit of the fair report privilege. *See Williams v. WCAU-TV,* 555 F. Supp. 198, 201-202 (E.D. Pa. 1983) (television news broadcast which provided fair and substantially accurate coverage of plaintiff's arrest on charges of bank robbery were protected by fair report privilege, notwithstanding the fact that plaintiff was subsequently released upon a determination that he was not involved in the crime).

The next question becomes whether Plaintiff has raised a genuine factual issue as to whether the privilege was abused. We conclude, as a matter of law, that he has not. To review, the fair report privilege is abused when the defendant overly embellishes or makes exaggerated additions to an account of a proceeding. Plaintiff complains about the Times' use of the terms "theft" and "stealing" in describing the criminal charges, but the Times' use of the word "theft" was an accurate description of the alleged criminal conduct, as Plaintiff was charged with "theft by unlawful taking or disposition." Moreover, we conclude that the term "stealing" is a substantially accurate description of the alleged misconduct, since "stealing" is commonly understood as synonymous with the act of theft, i.e., taking property, without permission or legal right, that belongs to another person without intent to return the same. *See Merriam-Webster's Online Dictionary*, http://www.merriam-webster.com/dictionary/theft (defining "theft" as "**1 a**: the act of stealing; specifically : the felonious taking and removing of personal property with intent to deprive the rightful owner of it **b**: an unlawful taking (as by embezzlement or burglary) of property"); *id*. at http://www.merriam-webster.com/dictionary/stealing (defining "stealing" as, *inter alia*, **1 a**: to take or appropriate without right or leave and with intent to keep or make use of wrongfully <*stole* a car>"). A defamation claim "cannot be premised solely on a newspaper's style or utilization of vivid words in reporting on a judicial proceeding." *Tucker*, 757 A.2d at 946 (citation omitted).

Plaintiff also complains that the Times' use of the terms "theft" and "stealing"

created false innuendo because an examination of the underlying acts with which he was charged would have revealed to the average reader that the alleged misconduct did not constitute theft. However, the March 26, 2005 article provides a summary of the accusers and their allegations which, on this record,[12] we find to be substantially accurate as a matter of law. Thus, readers were fairly provided the factual bases and legal theory underlying the theft charges and had the ability to draw the desired conclusion for themselves. In sum, a reasonable jury could not conclude that the article's use of the terms "theft" or "stealing" materially embellished the gist or "sting" of the underlying criminal charges. Because Plaintiff has failed to show the existence of a genuine issue of fact concerning abuse of the fair report privilege, that part of his claim which is premised upon the Times' reference to "theft" and "stealing" in the March 26, 2005 article cannot survive summary judgment.

2.    The February 7, 2006

On February 7, 2006, the Times ran an article entitled "Theft case against lawyer tossed." The subtitle read "Judge rules evidence lacking; 4 other cases pending." In pertinent part, the article reads as follows:

> A judge has thrown out one of the theft cases filed against a Pittsburgh lawyer accused of stealing from Erie-area clients.
>
> Judge John A. Bozza said the prosecution does not have enough evidence to prove lawyer Joseph Hudak unlawfully took money from a client for whom he allegedly did not file an appeal as promised.
>
> To prove the money was taken unlawfully, the prosecution would have to establish Hudak did not have a legal right to receive the money when he did, that he took the money fraudulently or deceptively, Bozza said.

---

[12] We note that Plaintiff has not supplied copies of the actual criminal complaints to support his brief opposing the pending summary judgment motion, nor has he identified any factual statement in the article's summary of "the accusers and their allegations" as inaccurate. Though we lack copies of the criminal complaints in this case, the essence of the Commonwealth's factual allegations can be gleaned from other information in the record, including the opinions of Judge Bozza, the Report and Recommendation of the Disciplinary Board, and the criminal informations.

Instead, Bozza said, the incident appeared to be more a violation of a contract, not a criminal matter.

The judge threw out one misdemeanor count of theft. But he also said the ruling should not be read as "suggesting in any way that Mr. Hudak properly carried out his professional responsibilities to his client."

The Erie County District Attorney's office has appealed Bozza's decision.

First Assistant District Attorney Robert Sambroak Jr. said the prosecution still believes that Hudak's actions amounted to a theft.

"My theory is he took the money for services. He didn't do the services. When he does not provide the services and does not give the money back, that's where it becomes a theft," he said.

Hudak did not return a call seeking comment.

The prosecution still has four other theft cases pending against Hudak, which Hudak has challenged. Bozza has not ruled on those challenges.

The Erie County District Attorney's Office had accused Hudak of accepting a total of more than $9,000 from four clients and failing to perform services as promised. It said in a fifth case Hudak or someone in his office improperly signed and cashed a client's $5,000 bond refund check and retained $2,000 of it.

In the case that Bozza dismissed, prosecutors alleged Hudak accepted $2,000 from Ann Rice to file an appeal on behalf of her son, David O'Connell, and that someone from Hudak's office began working on the appeal, but it was not completed.

Rice tried unsuccessfully to contact Hudak. He did not return the money to her, prosecutors said.

(*See* Def.s' Append. at Ex. 3 [25-4].)

To the extent Plaintiff challenges the Times' use of the terms "theft" or "stealing" in this article, we find these challenges insufficient to support a viable defamation claim. The essence of the story is a description of the status of ongoing judicial proceedings in the Plaintiff's pending criminal cases. Thus, assuming that the statements contained in the article are capable of defamatory meaning, their substance gives rise to a "privileged occasion" within the meaning of the fair report privilege. It is therefore up to Plaintiff to demonstrate that a jury could find an abuse of the privilege.

We conclude as a matter of law that no reasonable jury could find abuse here. For the reasons previously discussed, the Times' use of the terms "theft" and "stealing" accurately describes the nature of the criminal charges. Furthermore, the article's

20

description of the factual accusations that were being lodged by the District Attorney's office in support of the charges is substantially, if not completely, accurate. Plaintiff has not specified in his brief or in argument how the terms "theft" or "stealing" in this article have otherwise been embellished or spun so as to overcome the fair report privilege. Because abuse of the privilege cannot be established on this record, this aspect of Plaintiff's defamation claim fails as a matter of law.

3.    The April 14, 2006 Article

On April 14, 2006, the Times ran a story entitled "Lawyer sues Foulk, Times-News," which reported on the defamation suits then recently commenced by Plaintiff. The article reported on the general nature of the Plaintiff's allegations, the fact that he was seeking $1 million in damages in each of the lawsuits, the fact that the suits had been filed in bankruptcy court, and the fact that both the Times and Foulk characterized the suits as groundless. In the article, Plaintiff is referred to as "[a] Pittsburgh lawyer charged with stealing from clients." (Def.'s Append. at Ex. 4, [25-5].) Elsewhere, the article states that Plaintiff "originally was charged in five cases that he either stole money from Erie-area clients or took money from them and failed to perform legal services as promised." (*Id*.) The story goes on to explain that three of the criminal cases had (by then) been dismissed but that the remaining two were scheduled to go to trial. It elaborates as follows:

> In throwing out one of the five cases against Hudak in February, Bozza said the prosecution did not have enough evidence to prove Hudak stole money from a client who had retained him and from whom Hudak was accused of not filing an appeal. Bozza said the incident in that case appeared to be more of a violation of a contract rather than a criminal matter.

> Bozza said his dismissal of the case should not be read as "suggesting in any way that Mr. Hudak properly carried out his professional responsibilities to his client."

(Def.'s Append. at Ex. 4 [25-5].) Finally, the article notes that the District Attorney's office had appealed each of Judge Bozza's rulings dismissing the three cases.

21

To the extent Plaintiff's defamation claim is premised upon the Times' use of the term "stealing," that aspect of the claim cannot survive summary judgment. Here again, we find that the publication of this article involves a privileged occasion. Moreover, the term "stealing" (or derivations thereof) is a substantially accurate description of the nature of the criminal charges that had been brought against the Plaintiff, and those criminal charges were central to the various judicial proceedings which formed the subject matter of the April 14, 2006 article. Thus the Times' use of the term "stealing" was both substantially accurate and relevant to its report on Plaintiff's pending litigation. In addition, the term was used in the context of an article that discussed both the factual premise of the criminal charges (i.e., taking money from clients and failing to perform legal services) and the fact that Plaintiff's alleged conduct was found in at least one of the cases to involve a civil, rather than criminal, matter. Accordingly, readers were provided a basis from which they could glean the factual underpinnings of the criminal charges and draw the fair conclusion (if they were so inclined) that the alleged misconduct at issue did not implicate criminal conduct at all. Thus, this record does not support a finding that the fair report privilege was abused in connection with this aspect of the April 14, 2006 article. Plaintiff therefore cannot prevail on this part of his claim.

4.    The July 6, 2006 Article

On July 6, 2006, the Times ran an article entitled "Lawyer accused of stealing to get day in court." (Def.s' Append. at Ex. 5 [25-6].) The story begins by stating that "[a] suspended Pittsburgh lawyer originally accused of stealing from five sets of clients in Erie County is headed to trial in just one of the cases." (*Id*.) It goes on to explain that charges had been withdrawn in one of the two remaining criminal cases and that a jury trial would occur in the sole remaining case within one to two weeks. In relevant part, the piece states:

> Hudak, 51, in the remaining case is charged with theft by unlawful taking or disposition as a first-degree misdemeanor, and forgery as a second-degree felony. The Erie County District Attorney's Office is alleging Hudak or someone in his office improperly signed

22

and cashed a client's $5,000 bond refund check and retained $2,000 of it in April 2003.

> In the case the prosecution dismissed Wednesday, Hudak was charged with one count of theft by unlawful taking or disposition as a third-degree felony. The District Attorney's Office alleged the family of client Kelly Makela paid Hudak $4,750 in a criminal case in August 2003, and that Hudak did nothing to represent Makela except file a motion to have her released from prison on a nominal bond.

> The prosecution moved to dismiss the case because one of Makela's relatives in New York state mailed the money to Hudak's office in Pittsburgh, so authorities there would have to prosecute Hudak. The receipt of the money in Pittsburgh means Erie County Common Pleas Court "therefore lacks jurisdiction," Sambroak said in the dismissal motion.

(*Id.*)

Defendants contend that the statements contained in the July 6, 2006 article are protected by the fair report privilege. Because the subject matter of the article is a report of on-going judicial proceedings, we conclude that the challenged statements involve a privileged occasion.

We further conclude, as a matter of law, that Plaintiff has failed to demonstrate a genuine issue of fact as to whether the privilege was abused. The article accurately notes that Plaintiff was merely *accused* of theft, not that he was actually guilty of the crime. In addition, Defendants' use of the word "stealing" in reference to the criminal charges is substantially accurate for the reasons previously discussed and cannot serve as a basis for defeating the privilege.

However, Plaintiff complains that Defendants put a material "spin" on the criminal litigation by deliberately misrepresenting the nature of the criminal charges. Again, Plaintiff's theory seems to be that, "what is plainly understood to be theft or stealing was not even being alleged, let alone presented in evidence." (Pl.'s Br. in Opp. [30] at p. 6 of 10.) We disagree and conclude that no jury could rationally find an abuse of the fair report privilege on this basis. In the course of discussing the on-going judicial proceedings, the July 6, 2006 article references the factual allegations underlying at least one of the criminal cases (which concerned Plaintiff's representation of Kelly Makela). Thus, readers were provided an example of the common factual underpinnings of the charges that had been brought against Plaintiff. Further, the

23

article references the fact that four of the five criminal cases had been dismissed –
three of them over the prosecution's objection.  The article further references the fact
that, in at least one case, Judge Bozza had dismissed the charges on the ground that
the alleged misconduct involved a civil contract dispute rather than criminal conduct.
Finally, the article expressly acknowledged Plaintiff's position that he had done nothing
wrong.  On balance, the Times' report of the on-going proceedings was fair, was
substantially accurate, and added no materially greater "sting" than that which would
have been inflicted by a review of the existing judicial record.

Plaintiff complains that the article inaccurately describes the basis for the
dismissal of the Makela case, arguing that "the Defendants intentionally ignored the
pendency of papers identical to those resulting in Judge Bozza's other dismissals and
instead falsely implied that the plaintiff was still guilty but that the charges were
dismissed because of a geographical jurisdictional issue."  (Pl.'s Br. in Opp. [30] at p. 3
of 10.)  This claim also fails to give rise to a triable issue of fact.  Plaintiff does not
dispute that the criminal case stemming from his representation of Makela was
dismissed upon a voluntary motion by the prosecution, nor does he dispute that the
basis for that motion, as articulated by the District Attorney's office (*i.e.*, the movant),
was a jurisdictional concern.  Further, Plaintiff does not claim that, in granting the
motion, Judge Bozza relied on grounds other than those presented in the prosecution's
motion.  Thus, the Times' report of these events was at least substantially, if not
completely, accurate.

Plaintiff suggests that the Times should have drawn the inference that the
Makela matter was dismissed (or would inevitably have been dismissed) as a result of
the same legal deficiencies that caused Judge Bozza to dismiss three of the other
criminal cases – i.e., the alleged facts were facially insufficient to support any criminal
misconduct.  However, the Times' July 6, 2006 article accurately reports the
proceedings in the Makela case as they occurred.  It accurately describes the
"jurisdictional concern" with the Makela case as the *prosecution's theory* as to why

24

dismissal was appropriate.  Moreover, given the story's reference to the three other criminal cases which had been dismissed involuntarily, readers could draw the inference, if they so chose, that the Makela matter also lacked legal merit and was inevitably headed toward dismissal.  In sum, the foregoing challenges to the July 6, 2006 article fail to support an actionable defamation claim.

5.    The July 11, 2006 Article

Following Plaintiff's acquittal in the fifth and final criminal matter, the Times ran a story on July 11, 2006 entitled "Hudak found innocent in theft case."  (*See* Def.s' Append. at Ex. 6 [25-7].)  The story, which we quote in its entirety, reads as follows;

> A now-suspended Pittsburgh lawyer was acquitted of a charge that he stole $2,000 from an Erie County client by taking the money and failing to provide legal services.
>
> After hearing a day of testimony and deliberating an hour and 15 minutes, a jury Monday found Joseph Hudak not guilty of one count of theft by unlawful taking, a first-degree misdemeanor that carries a maximum sentence of five years in a state prison.
>
> Hudak, 51, who represented himself, argued that he did nothing criminal, though he said he did not handle the client's case well.
>
> The jury of nine women and three men agreed.
>
> "He didn't really represent her best interest, but, as a jury, we thought it was more a breach of contract, not a criminal act," jury forewoman Ann Stonesifer said after the jury issued the verdict in the courtroom of Erie County Judge John A. Bozza.
>
> Juror Mary Weinberg agreed.  "It is civil.  It would never be a criminal act," she said.
>
> Hudak and the prosecutor, First Assistant District Attorney Robert Sambroak, declined comment after the verdict.
>
> Sambroak argued in court that Hudak intended to deprive the client, Albion resident Joanne Catron, of the $2,000, in 2003, when Hudak was still practicing law.  Hudak has been suspended as a lawyer since March 2005, and served a prior suspension between early October 2003 and mid-February 2004, according to court records.
>
> Sambroak said Catron paid Hudak's law firm $550 to represent her at an April 2003 preliminary hearing on a charge of conspiracy to commit perjury and six related counts.
>
> Sambroak said Hudak performed that work.  But he said Hudak then took an additional $2,000 from Catron and did nothing to represent her as her case approached trial.
>
> "He clearly didn't do the work," Sambroak said.  "After the preliminary hearing, he did nothing."

25

Hudak told the jury in his closing argument: "It wasn't handled well. But for her to say 'I was criminally defrauded,' that is just ridiculous."

A public defender ended up representing Catron at trial, in March 2004. She was convicted of two counts, acquitted on one and had the other charges dismissed, according to court records. She was sentenced to three and a half to 23 ½ months in Erie County Prison and two years of probation in April 2004.

Catron got her $2,000 back, but not from Hudak.

Hudak cited testimony that the Pennsylvania Lawyers Fund for Client Security refunded Catrone [sic] the $2,000 after she complained about Hudak. The fund, which the state Supreme Court established in 1982, is now seeking $2,000 from Hudak, according to testimony.

Hudak said Catron was not out the $2,000. Sambroak responded that Hudak never refunded Catrone [sic] the $2,000 himself, though Catrone [sic] fired him and asked for the money back in August 2003.

"Sounds like theft," Sambroak said in his closing argument.

Hudak had been charged with forgery in the case, but the prosecution withdrew that count, a second-degree felony, before the trial.

**A series of wins for Hudak**

The acquittal is the latest in a string of legal victories for Hudak, who has said he is trying to win reinstatement to the Pennsylvania bar.

He was originally charged in 2005 with stealing from clients in five cases in Erie County. One of the cases ended with Monday's not-guilty verdict. The District Attorney's Office withdrew charges in another case last week, and Bozza earlier this year dismissed three other cases for legal reasons.

Bozza said in one of those cases the incident in dispute appeared to be more of a violation of a contract than a criminal matter. Bozza also said his dismissal of that case should not be read as "suggesting in any way that Mr. Hudak properly carried out his professional responsibilities to his client."

The District Attorney's Office has appealed those dismissals to state Superior Court.

The state Supreme Court twice suspended Hudak from practicing law, most recently in March 2005. That suspension was for a year and a day, with four and a half months of credit for the previous suspension. The March 2005 suspension was over eight cases, including Catron's.

"There is ample justification before this Board to suspend Respondent. He neglected his obligations to clients in eight separate matters," the Disciplinary Board for the state Supreme Court said in Hudak's case in October 2004. The state Supreme Court used the board's findings to suspend Hudak on March 1, 2005.

Hudak in April said he is currently not practicing law as he awaits word on whether the state Supreme Court will reinstate him to the bar. Hudak remains suspended, according to the Web site for the Disciplinary Board for the state Supreme Court.

The suspension did not prevent Hudak from representing himself Monday.

Neither Sambroak nor Hudak mentioned Hudak's disciplinary problems to the jury. Hudak defended his overall work as a lawyer.

He told the jury he has represented clients in hundreds of cases, "most of which are successful and have good results."

Speaking to the jury as he started his closing argument in his own case, Hudak said: "I'm glad that we are done. I surely don't like being here."

(*Id.*)

Despite the fact that much of the foregoing article exonerates Plaintiff, he challenges certain aspects as defamatory. As with the other articles discussed previously, Plaintiff objects to the Times' use of the terms "theft" and "stealing" and to its treatment generally of the pending legal proceedings.

Because the article is a report of a judicial proceeding (Plaintiff's trial), it is subject to the conditional fair report privilege. Plaintiff must therefore demonstrate that there is a genuine issue of fact as to whether the Times abused this privilege by materially embellishing or "spinning" the story. This he cannot do.

As we discussed previously, the Times did not abuse the privilege in using the terms "theft" and/or "stealing" to describe the nature of Plaintiff's criminal charges, as those are substantially accurate descriptive terms. Furthermore, Plaintiff cannot show that the July 11, 2006 article somehow misrepresents the true nature of the criminal charges in the Catron matter, because the underlying factual allegations of those charge are discussed in detail. The story also acknowledges Plaintiff's position at trial that he had done nothing wrong, and it cites two jurors' conclusions that the alleged misconduct involved a civil dispute rather than criminal wrongdoing.

Plaintiff complains in his brief that, following his acquittal in the Catron matter, "Defendants took statements out of context and used the statements to create false implications and innuendo." (Pl.'s Br. in Opp. [30] at p. 3 of 10.) Though Plaintiff does not elaborate factually on this point, it appears from the record that he is challenging the article's reference to his closing argument where he reportedly admitted that he did not

handle Ms. Catron's case well. Plaintiff has maintained that he was misquoted by the Times and that, in fact, he admitted in his closing argument only that communications between Ms. Catron and *members of his staff* were not handled well; his own legal representation of Ms. Catron, he insists, was good. Although the trial transcript is not part of our record, for present purposes we will credit Plaintiff's assertion that this remark in his closing argument was misquoted by the Times.

Nevertheless, to the extent that this inaccuracy remains part of Plaintiff's defamation claim, it does not amount to an abuse of the fair report privilege. Plaintiff is ultimately responsible for the acts of his own agents and, therefore, a staff member's mishandling of a client's case inevitably reflects poorly on Plaintiff. Moreover, the July 11 article accurately reports that Plaintiff's handling of Ms. Catron's case had been criticized both by the jury foreperson (who opined that Plaintiff did not represent Ms. Catron's best interest) and by the Pennsylvania Disciplinary Board. Thus, even if the article is inaccurate in suggesting that Plaintiff admitted to *personally* mishandling Ms. Catron's case, this inaccuracy did not inflict any materially greater "sting" than that which a precise understanding of the truth would have inflicted. As a matter of law, no jury could reasonably find an abuse of the fair report privilege based on the Times' alleged misquoting of Plaintiff's closing remarks.

B.

Plaintiff's defamation claim also rests, in part, on the Times' report in its March 26, 2005 article of Brad Foulk's comment that "[s]ome folks clearly were not only defrauded of money, they were not provided adequate representation. That's a one-two punch on the whole system." (See Def.'s App. at Ex. 2 [25-3].) Plaintiff claims that Foulk's statement is defamatory in two respects: it falsely implies that Plaintiff committed fraud (when in fact he was never charged with either fraud or theft by deception), and it falsely implies that Plaintiff provided inadequate representation to his clients. We conclude that the challenged statement is capable of defamatory meaning.

Here again, however, Defendants contend that the Times' printing of Foulk's

28

remark is protected by the fair report privilege. Resolution of this issue is not as straight-forward as it might initially seem; the comment was not made in open court or in a filed court paper but during an interview with a newspaper reporter. Neither party has directed us to any Pennsylvania law which directly addresses whether such occasions give rise to the fair report privilege in this Commonwealth. Plaintiff cites no law on the matter and Defendants have referred us to cases in which prosecutors, speaking at press conferences about matters pending within their offices, have personally been protected from defamation claims under the absolute privilege afforded to high public officials. *See, e.g., Mosley v. Observer Publishing Co.*, 619 A.2d 343, 346 (Pa. Super. 1993), *appeal denied*, 629 A.2d 1382 (Pa. 1993); *Pickering v. Sacavage*, 642 A.2d 555, 559 (Pa. Commw. Ct. 1994), *appeal denied*, 652 A.2d 841 (Pa. 1994); *McCormick v. Specter*, 275 A.2d 688, 689 (Pa. Super. 1971). None of the cases cited by Defendants specifically address whether the media, when reporting on such matters, are conditionally protected by the fair report privilege.

For guidance on this issue, we begin by considering § 611 of the Restatement (Second) of Torts, which sets forth the basic parameters of the fair report privilege as follows:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611 (1977). Although the Pennsylvania Supreme Court has never officially adopted § 611 of the Second Restatement, it long ago adopted the earlier version set forth in the First Restatement, *see Sciandra*, 187 A.2d at 588-89, and many Pennsylvania courts have assumed that the Supreme Court would adopt, in some fashion, the more recent version of § 611. *See, e.g. Norton v. Glenn,* 860 A.2d 48, 62 (Pa. 2004) (Castille, J., concurring) (observing that, while the Pennsylvania Supreme Court has not yet formally adopted § 611 of the Restatement (Second) of Torts, that provision has been successfully advanced by the media in

Pennsylvania cases); *Curran v. Philadelphia Newspapers, Inc.*, 439 A.2d 652, 661-62 (Pa. 1981) (suggesting that fair report privilege of Restatement (Second) of Torts *would have protected* newspaper's report of U.S. Attorney's comments at press conference *if* report had been fair and accurate); *Mosley v. Observer Publishing Co.*, 629 A.2d 965, 969, 970 (Pa. Super. 1993) (discussing fair report privilege and citing to Second Restatement); *Grund v. The Bethlehem Globe Publishing Co.*, 23 Pa. D. & C. 3d 371, 378-79 (Northumberland Cty. 1982) (applying § 611 of the Second Restatement and noting that, although that provision "has not been expressly adopted" in the Commonwealth, the Pennsylvania Supreme Court "has not hesitated to adopt" sections of the Restatement (Second) of Torts) (citations omitted); *Williams v. WCAU-TV*, 555 F. Supp. 198, 201 (E.D. Pa. 1983) (predicting that Pennsylvania will adopt § 611 of Restatement (Second) of Torts and applying that privilege).

We likewise conclude that the Supreme Court of this Commonwealth would recognize § 611 of the Second Restatement as authoritative. The next question is whether Mr. Foulk's remarks constitute a "report" of "an official action or proceeding" within the meaning of § 611, such that the fair report privilege is triggered.

Notably, two federal courts applying Pennsylvania law have interpreted the concept of "reports of official action" somewhat broadly where the challenged publications involved reports of criminal investigations or arrests. In *Mathis v. Philadelphia Newspapers, Inc.*, 455 F. Supp. 406 (E. D. Pa. 1978), the plaintiff, John Mathis, sued two newspapers and other parties that had mistakenly identified him as one of two suspects arrested and arraigned on charges of kidnaping and bank robbery. Both newspaper articles accurately stated that the two suspects were brothers named John and Tyrone Mathis. In addition, both articles included photographs purporting to be depictions of the suspects and provided information as to the suspects' respective ages and addresses. However, each of the articles had mistakenly included the plaintiff's photograph in place of that of an actual suspect (in one article, plaintiff was erroneously identified as Tyrone Mathis; in the other article he was erroneously

identified as John Mathis).  These photographs had been provided to the newspapers by the Philadelphia police department.  To compound matters, one of the articles, based on misinformation supplied by the police, incorrectly used the plaintiff's age and address in describing the "John Mathis" suspect, and this misinformation was repeated in a subsequent news story.  Though neither article expressly credited law enforcement authorities as the source of their information, it was undisputed that both articles had relied on data supplied by the Philadelphia police department and the FBI.  The photographs, which purported to identify the suspects but which incorrectly identified the plaintiff, had been errantly supplied by the "night command" of the Philadelphia police department, which the court described as "the designated source for official information regarding the activities of detectives within the Philadelphia Police Department."  455 F. Supp. at 416.

At issue in *Mathis* was whether the newspapers' defamatory coverage of the plaintiff was protected by the fair report privilege.  There was no question in that case that the media had accurately reproduced information which had been supplied, erroneously, by law enforcement officials.  Thus, the question was whether the media's republication of that information was an occasion that could trigger application of the fair report privilege.  The *Mathis* court concluded that it was.  Notably, the *Mathis* court cited § 611 of the Restatement (Second) of Torts as the "applicable privilege" under Pennsylvania law.  *See* 455 F. Supp. at 415-16.  The court then cited to comment d of § 611 which states, in pertinent part, that "[t]he filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege."  *See* Restatement (Second) of Torts § 611 comment d.  The *Mathis* court concluded that "what [the defendant newspapers] each published was in effect a report of an informal governmental report concerning the Mathis brothers' arrest."  455 F. Supp. at 416.  Because the articles in question were accurate accounts of the "informal report" supplied by the police, the court found that the privilege could not have been forfeited by the defendants' simple negligence in failing to discover the

inaccuracy of the information. *Mathis*, 455 F. Supp. at 416-17.

In *Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir. 1981), the Third Circuit Court of Appeals took this principle one step further. *Medico* posed the question whether the defendant news magazine could invoke the fair report privilege in relation to its published summary of non-public FBI documents in which the plaintiff, a private citizen, had been identified as a member of an organized crime "family." The dispute in *Medico* grew out of an article published by Time magazine which discussed suspected criminal activities of then-Congressman Daniel J. Flood and the fact that Flood had been under investigation by federal law enforcement authorities. The gist of the disputed publication concerned Time's report that Flood had steered government business to the plaintiff's firm and that Russell Bufalino, a "Pennsylvania Rackets Boss," 643 F.2d at 135, had referred to the plaintiff in tape-recorded conversations as a "capo" in his mafia family. Time's report was based upon a summary of private FBI documents that had been released to Time in an unauthorized leak. The trial court had found that the fair report privilege applied, notwithstanding the non-public nature of the underlying FBI documents, and it granted summary judgment for Time.

In reviewing this ruling, the *Medico* court began by predicting that Pennsylvania would accept the Second Restatement's version of the fair report privilege as the applicable legal standard. 643 F.2d at 138. The court then framed the relevant inquiry as "whether Time's summary of FBI documents concerning [the plaintiff] is 'a report of an official action or proceeding'" within the meaning of § 611. *Id*. at 138-39. The plaintiff insisted that the documents should not be deemed "official" because they expressed only tentative and preliminary conclusions that had never been formally adopted by the FBI. Neither the text of § 611 nor the accompanying comments, the court noted, definitively resolved this challenge.

The court found some support for applying the privilege in comment d of the Restatement – which extends the privilege to news publications concerning "[t]he filing of a report by an officer or agency of the government" – because the FBI had included

the allegedly defamatory material in a report on Philadelphia mafia activities and had forwarded the material for inclusion in a report on nationwide organized crime. *Id*. at 139. The court found arguably contrary authority, however, in the language of *comment h*, which pertains to "arrests"[13]: "[b]ecause the FBI's information concerning Medico never led to an arrest or prosecution, the FBI materials may be thought to stem from such an early stage of official proceedings that the section 611 privilege does not attach." *Id.*[14]

The *Medico* court also concluded that its query could not be definitively answered by reference to Pennsylvania cases pre-dating the Second Restatement, but it found "strong[] support" for applying the privilege in two decisions. The *Medico* court cited to *Sciandra*, *supra,* as a case in which the Pennsylvania Supreme Court had announced the fair report privilege in "broad terms," 643 F.2d at 139, applying it to a series of newspaper articles based on the "Reuter Report," which was a study commissioned by the governor of New York concerning activities and associations of individuals who had attended a meeting of alleged organized crime figures. The court acknowledged, however, that the "Reuter Report" bore "stronger indicia of representing an official [governmental] act" than the FBI materials at issue in *Medico*, since the

---

[13] Comment *h* to § 611 provides that:

An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand, statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.

Restatement (Second) of Torts § 611 comment h.

[14] We note that this particular concern is not implicated in the case at bar because Mr. Foulk's comments were made only after Plaintiff had been formally arraigned on criminal charges.

former had been filed with the governor and released to the public.  *See id*. at 140.  The

court also cited to *Hanish v. Westinghouse Broadcasting Co.*, 487 F. Supp. 397 (E.D.

Pa. 1980), in which the fair report privilege had been applied to an allegedly defamatory

news report summarizing a civil complaint upon which the court had taken *ex parte*

judicial action.  The *Medico* court found that *Hanish* provided further support for

application of the fair report privilege to the challenged Time article:

> FBI files seem at least as "official" as the pleadings in civil cases.
> Although civil complaints are instituted, for the most part, by private
> parties, the FBI documents concerning Medico were compiled by
> government agents acting in their official capacities.  Moreover, the
> danger that a civil litigant will willfully insert defamatory assertions
> in his complaint generally would appear at least as great as the risk
> that a criminal investigatory agency will knowingly include false or
> malicious statements in its files.  If Pennsylvania courts would grant
> the privilege to newspaper accounts of civil complaints on which a
> court has acted ex parte, we think it likely that they would grant the
> privilege to republication of defamatory items from FBI materials on
> Medico.

643 F.2d at 140.

The *Medico* court found still more support for application of the fair report

privilege in consideration of the doctrine's underlying policy rationales.  One theory, the

"public supervision" theory, recognizes that "it is of the highest moment that those who

administer justice should always act under the sense of public responsibility and that

every citizen should be able to satisfy himself with his own eyes as to the mode in

which a public duty is performed."  *Id*. (citing *Cowley v. Pulsifer*, 137 Mass. 392, 394

(1884) (Holmes, J.)).  The court found this theory particularly applicable because the

public's general interest in supervising the activities of the FBI were especially acute

where the FBI's activities concerned the investigation of an elected official.  Though the

plaintiff, a private individual, may have been defamed in the process, the court

reasoned that "the public has a lively interest in considering the relationships formed by

elected officials."  *Id*. at 142.  The court noted that another rationale underlying the

privilege – the public's interest in learning of important matters – further supported

application of the privilege to Time's article.  The public, the court concluded, had a

legitimate interest in examining not only the affairs of elected officials, but also reports on investigations of organized crime. *Id*. While cautioning that "[p]ersonal interests in privacy are not to be taken lightly, and are not to be overborne by mere invocation of a public need to know," the court concluded that "the public interest is involved when ... information compiled by an enforcement agency may help shed light on a Congressman's alleged criminal or unethical behavior." *Id*. at 142-43. Based largely on the foregoing analysis, the Third Circuit concluded that the Pennsylvania Supreme Court would apply the fair report privilege to the challenged Time article.

Collectively, the *Mathis* and *Medico* rulings suggest that Pennsylvania courts give a somewhat broad interpretation to the concept of "reports of an official action or proceeding," as set forth in the Second Restatement. We conclude that the reported remarks of Mr. Foulk, which Plaintiff challenges in this case, should likewise be viewed as a "report" of "official action" giving rise to a privileged occasion. Here, it is undisputed that, following Plaintiff's formal arrest on criminal charges, Defendant Thompson went to the District Attorney's office in her capacity as a reporter for the Times for the express purpose of eliciting an official comment on the charges. (*See* Affidavit of Lisa Thompson [32] at ¶ 4.) She met with Mr. Foulk, face-to-face, in his office, asked him to officially comment on the case for purposes of publication, and recorded his statement directly. (*Id*. at ¶¶ 4-5.) Mr. Foulk, as District Attorney of Erie County, is the chief law enforcement officer of the county and is *the* official voice with respect to matters pending before his office. While his on-the-record comments were made in the context of an informal, one-on-one meeting with Ms. Thompson, they served the same purpose as a press release or press conference. Accordingly, Defendant Thompson's report of Mr. Foulk's comments constitute a "report of an official action or proceeding" for purposes of the fair report privilege. *C.f. Curran v. Philadelphia Newspapers, Inc.*, 439 A.2d 652, 661-62 (Pa. 1981) (suggesting in dicta that the fair report privilege of Restatement (Second) of Torts *would have protected* newspaper's report of U.S. Attorney's comments at press conference *if* report had been

35

fair and accurate).

Consideration of the policy rationales discussed in *Medico* supports this conclusion. In light of Mr. Foulk's stature within the local government, the "public supervision" theory has particular relevance. As an important elected public official, Mr. Foulk has an indisputable obligation to inform the public as to matters occurring within his office. *See McCormick v. Specter*, 275 A.2d 688, 689 (Pa. Super. 1971) (District Attorney's press conference was a proper undertaking of that office, since the responsible performance of District Attorney duties warrants his informing the public of matters pending in that office). Thus, in obtaining from Mr. Foulk an official comment on a pending criminal matter for the express purpose of public dissemination and then publishing that information, Defendant Thompson was furthering the public interest in ensuring "that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Cowley*, *supra* (cited in *Medico*, 643 F.2d at 141). As the *Medico* court observed, "public scrutiny of the proceedings and records of criminal investigatory agencies may often have the equally salutary effect of fostering among those who enforce the laws 'the sense of public responsibility.'" 643 F.3d at 141.

Finally, our conclusion that the fair report privilege conditionally applies to the reported comments of Mr. Foulk is supported by case law from other jurisdictions which have applied the privilege in similar contexts. *See, e.g., Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003) (applying the fair report privilege to news stories about arrestee that were based on official interviews with police chief; report of police chief was "clearly an 'official statement'"); *Alsop v. The Cincinnati Post*, 24 Fed. Appx. 296, 297-98, 2001 WL 1450784 at **1 (6th Cir. 2001) (privilege applied to newspaper's statement that plaintiff sold crack cocaine to informants at his store, where challenged statement was based on information obtained from U.S. Attorney's press release) (applying Ohio statutory privilege); *Thomas v. Telegraph Pub. Co.*, 929 A.2d 993, 1010 (N.H. 2007) (suggesting

that the privilege would not automatically protect reports of all private conversations between police officers and reporters but would protect reports that bear sufficient indicia of accuracy and that are based upon press conferences, interviews with a police chief, or other types of official conversations); *Wright v. Grove Sun Newspaper Co., Inc.*, 873 P.2d 983, 988 (Okla. 1994) (privilege applied to newspaper that republished information naming plaintiff in connection with a drug investigation based on information distributed at district attorney's press conference); *Tilles v. Pulitzer Pub. Co.*, 145 S.W. 1143, 1149-52 (Mo. 1912) (privilege applied to press interview with state attorney general acting under gubernatorial edict and discussing contemplated criminal proceeding) (*en banc*); *Freedom Communications, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602 at *3-4 (Tex. App.- Eastland June 15, 2006) (privilege applied to news accounts which incorrectly identified plaintiff as sex offender based on police department news release) (citing to Second Restatement § 611); *Steer v. Lexleon, Inc.*, 472 A.2d 1021, 1024 (Md. App. 1984) (privilege applied to news account wrongly identifying crime victim as perpetrator where errant information was obtained from an authorized release of arrest information through an official governmental channel). *Cf. Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W. 3d 270, 287 (Tenn. App. 2007) (noting that "[o]fficial actions and proceedings are the core of the fair report privilege" and declining to apply the privilege where the allegedly defamatory publication was not based upon any official action, report or proceeding).

Plaintiff insists that the fair report privilege cannot apply here because the allegedly defamatory statement was recorded in the context of a one-on-one meeting between Mr. Foulk and Ms. Thompson. He contrasts this situation to the more traditional and formal contexts where a public press conference is held by a prosecuting attorney, or where a formal press release is made concerning a pending criminal proceeding. Plaintiff acknowledges, however, that he can cite no case law in support of his position, and in light of the foregoing authority, we find Plaintiff's attempt to distinguish this case unpersuasive. The touchstone of the fair report privilege seems to

be whether there exist sufficient indicia of "officialdom" in the reported communication. The record here supports but one conclusion: though Mr. Foulk's remarks to Ms. Thompson occurred in a casual setting, they constituted an official, on-the-record report concerning governmental action undertaken within the scope of Mr. Foulk's office.

In sum, we conclude that the Pennsylvania Supreme Court would generally recognize § 611 of the Second Restatement of Torts as stating the applicable standard of law and that it would apply the privilege to the remarks of Mr. Foulk as reported in the Times' March 26, 2005 news article. Thus, Ms. Thompson's report of Mr. Foulk's statement gives rise to a privileged occasion.

Plaintiff alternatively claims that the privilege was abused in that the Times embellished the account of his criminal proceedings by putting its own "spin" on the story. To determine whether the fair reporting privilege has been overcome, the court must consider whether a reasonable person, comparing the underlying government report and the article as a whole, could conclude that the article was a fair and accurate rendition of the government report. *See First Lehigh Bank*, 700 A.2d at 503. "An action for defamation cannot be premised solely on [the] defendant's style or utilization of vivid words" in reporting on the subject matter. *Binder*, 275 A.2d at 58. Furthermore, the privilege does not require a verbatim recitation of the governmental report or proceeding being reported on; rather, it merely requires a summary of the report or proceeding that is substantially accurate. *Sciandra*, 187 A.2d at 589.

With respect to Foulk's comments about Plaintiff's clients being "defrauded" and/or being provided "[in]adequate representation," the record here cannot support a finding that the fair report privilege was abused. Significantly, Plaintiff does not dispute the fact that Foulk made the statement attributed to him. To be sure, he disputes the substance of Foulk's remark, but he does not dispute that the remark was made, nor does he dispute that the Times reported the remark accurately. Thus, insofar as the Times' report of Foulk's comment is concerned, no jury could reasonably find that the Times "spun" or "embellished" Foulk's words so as to forfeit the privilege.

38

However, Plaintiff claims that Defendants "took other matters involving the Plaintiff and wove them with Mr. Foulk's comment and charges to create misleading and sensationalized implications and innuendo that were false and that the Defendants knew were false." (Pl.'s Br. in Opp. [30] at p. 2 of 10.) Plaintiff has not elaborated, either in his brief or at oral argument, on the "other matter" to which he refers. "Other matters" might arguably include the Times' reference to Plaintiff's license suspension; however, Plaintiff at a prior proceeding in this matter forswore any claim of liability or damages based upon the Times' reference to his disciplinary proceedings. (*See* Tr. of Hearing on Def.s' Mot. for Sanctions and Mot. for Revised Case Management Order [21] at pp. 15-16 of 25.)

The only other "matter" that the article refers to is the contempt judgments that had been entered against Plaintiff by Judges Cashman and Cunningham. The Times' March 26, 2005 story makes two references to these events. It states that "judges in Erie and Allegheny counties have held [Plaintiff] in contempt for failing to appear in court in recent years," and it elaborates on Judge Cunningham's finding as follows:

> In June 2003, Cunningham held Hudak in a courthouse holding cell for several hours, then cited him for contempt and fined him $500 for failing to appear in [Eugene] Case's case in May 2003. Hudak blamed his failure to appear in Case's case on a scheduling conflict. He also charged that he had not received notice for Cunningham's contempt hearing in May 2003.

(Def.s' Append. at Ex. 2 [25-3].)

Assuming that these references are capable of defamatory meaning, they would give rise to a privileged occasion, because they involve a report of official judicial proceedings. Moreover, a jury would not be justified in finding an abuse of the privilege on this record because, as a matter of law, the gist of the article is substantially accurate. While it is true that Judge Cashman's contempt judgment was subsequently vacated – a fact that the article does not mention – this omission does not so appreciably add to the "sting" of the article as to materially alter the effect that the article would otherwise have on the mind of the reader. Judge Cashman's finding of contempt

39

is not a major focus of the article and is mentioned only once in passing. When counterbalanced with the other accurate information provided in the article – that Plaintiff had been found in contempt by another Judge; that various clients had accused him of taking fees and not performing the agreed-upon services; that he had been suspended by the state Supreme Court – the article's reference to Judge Cashman's contempt judgment does not materially change the gist of the story.

C.

Plaintiff's defamation claim is also premised partly upon the Times' treatment of Judge Bozza's dismissal of three of the criminal cases. The record reflects that, on January 18, 2006, Judge Bozza entered a Memorandum Opinion and order granting Plaintiff's petition for habeas corpus relief and quashing the criminal information in the case arising out of Plaintiff's representation of David O'Connell, No. 1401 of 2005. In his opinion, Judge Bozza explained that the Commonwealth had failed to establish probable cause that Plaintiff had committed the crime of theft by unlawful taking. Specifically, Judge Bozza found that the evidence was insufficient to establish the critical elements of an "unlawful" taking of property belonging "to another." Judge Bozza wrote that Plaintiff had "received the money lawfully as a result of a fee agreement" with the client's mother and, therefore, "title to the money passed to Mr. Hudak such that it no longer constituted the property of another." *Commonwealth v. Hudak*, No. 1401 of 2005 (Erie County C.C.P. Jan. 18, 2006) (filed at Def.'s Append. Ex. 12 [25-14] at p. 4 of 10). Citing the case of *Commonwealth v. Austin*, 393 A.2d 36 (Pa. Super. 1978), Judge Bozza noted that decision's holding that the receiving of "advance money" on a construction contract and failure thereafter to perform the construction work did not constitute the obtaining of property of another, but rather, civil breach of a contract. Judge Bozza concluded: "While the testimony at the preliminary hearing was sufficient to establish that there was good reason to believe Mr. Hudak violated the terms of the contract, it was insufficient to establish probable cause to believe that he committed a crime of theft." *Id*. at p. 4.

40

On July 14, 2006, the Erie County Legal Journal published a decision authored by Judge Bozza following his dismissals of two other criminal cases: one arising out of Plaintiff's representation of Mark Pollard (No. 1398 of 2005) and the other arising out of Plaintiff's representation of Eugene case (No. 1400 of 2005). *See Commonwealth v. Hudak,* Nos. 1398 & 1400 of 2005, 89 Erie 168, 171 (Pa. Com. Pl. July 14, 2006) (included in the record at Def.s' Append., Ex. 12 [25-14]). Judge Bozza noted in his decision that the two cases presented "a purely legal issue as to whether, in light of the Commonwealth's theory of liability, the conduct in question constitutes the crime of Theft by Unlawful Taking or Disposition." *Id*. at p. 6, 89 Erie at 169. Judge Bozza framed the issue as "whether in the absence of proof of deception in obtaining payment of his legal fee, Mr. Hudak can be convicted of Theft By Unlawful taking for failing to return some or all of the fee when he breached his contract." *Id*. As he had in Case No. 1401, Judge Bozza concluded that the Commonwealth could not meet its *prima facie* burden of establishing probable cause to believe that Plaintiff "unlawfully" took or exercised control over the property of "another." *Id*. at 8, 89 Erie at 171. He found that, in each instance, "the evidence was only sufficient to establish that the defendant may have violated the terms of his contracts with his clients." *Id*.

Plaintiff argues that Judge Bozza's opinions were "clear" and complains that, despite coming into possession of the opinions, Defendants continued to publish and disseminate false and defamatory reports of the proceedings. Specifically, he seems to be complaining that the Times' reference to the dismissals made it appear as though the cases were dismissed due to an insufficiency of evidence to meet the state's burden of proof rather than explaining that the charges were legally groundless on their face.

Four of the articles being challenged in this lawsuit address one or both of Judge Bozza's rulings. The February 7, 2006 article reports on Judge Bozza's first dismissal ruling. The April 14, 2006, July 6, 2006, and July 11, 2006 articles all report on the facts that: (i) Judge Bozza had dismissed three of the criminal cases and (ii) each of

those dismissals had been appealed by the District Attorney's office to the Superior Court. The February 7, 2006 article is entitled "Theft case against lawyer tossed," and the subtitle states "Judge rules evidence lacking; 4 other cases pending." (Def.s' Append at Ex. 3 [25-4].) The article continues:

> A judge has thrown out one of the theft cases filed against a Pittsburgh lawyer accused of stealing from Erie-area clients.
>
> Judge John A. Bozza said the prosecution does not have enough evidence to prove lawyer Joseph Hudak unlawfully took money from a client for whom he allegedly did not file an appeal as promised.
>
> To prove the money was taken unlawfully, the prosecution would have to establish Hudak did not have a legal right to receive the money when he did, that he took the money fraudulently or deceptively, Bozza said.
>
> Instead, Bozza said, the incident appeared to be more a violation of a contract, not a criminal matter.
>
> The judge threw out one misdemeanor count of theft. But he also said the ruling should not be read as "suggesting in any way that Mr. Hudak properly carried out his professional responsibilities to his client."
>
> The Erie County District Attorney's office has appealed Bozza's decision.
>
> First Assistant District Attorney Robert Sambroak Jr. said the prosecution still believes that Hudak's actions amounted to a theft.
>
> "My theory is he took the money for services. He didn't do the services. When he does not provide the services and does not give the money back, that's where it becomes a theft," he said.
>
> Hudak did not return a call seeking comment.
>
> ***

(*Id.*) The Times' coverage in the other three articles is more abbreviated but substantially identical.

As a preliminary matter, we agree with the Times' position that its treatment of Judge Bozza's rulings in these articles gives rise to a privileged occasion. Because Judge Bozza's ruling were part of official judicial proceedings, the fair report privilege conditionally applies.

The critical question, once again, becomes whether Plaintiff has demonstrated a triable issue of fact as to abuse of the privilege. We conclude that he has not. Plaintiff

42

complains that the Times' coverage of the rulings implies that he was guilty of the theft charges but the Commonwealth simply could not prove it. Although the February 7, 2006 article does make reference to an insufficiency of evidence, no jury could reasonably find, based on that language, that the Times unfairly spun the essence of Judge Bozza's opinion so as to materially alter the gist of the ruling. Read in context, the article's reference to insufficient evidence clearly refers to the prosecution's inability to prove that Plaintiff took money *unlawfully* from his clients; the article accurately implies that Judge Bozza ruled that the prosecution could not establish that Plaintiff took money fraudulently, deceptively, or otherwise without legal right. Importantly, the article clearly makes the fundamental point that Judge Bozza viewed the incident as a potential contract violation rather than a criminal matter. In fact, each of the four articles in question expressly refers to Judge Bozza's conclusion that the case he was dismissing involved a civil contract dispute rather than criminal misconduct. Accordingly, the record does not support an abuse of the fair report privilege on that basis.

Plaintiff has also complained of the Times' statement in the July 6 and July 11, 2006 articles that three of the criminal cases were dismissed by Judge Bozza for "legal reasons." According to Plaintiff, that term inaccurately implies that the dismissals were based on minor legal technicalities rather than a lack of merit. Plaintiff has complained that the July 6 article also omits reference to Judge Bozza's conclusion that the facts as alleged by the prosecution did not constitute a crime. Once again, we find this evidence insufficient to support a triable issue of abuse of the fair report privilege. The Times' description of the dismissals as being based on "legal reasons" was an accurate description; in fact, in his memorandum opinion published in the Erie County Legal Journal on July 14, 2006, Judge Bozza characterized the decisive issue in the cases as a "purely legal" one – i.e., whether the Commonwealth's theory of liability could legally amount to criminal conduct on the part of Plaintiff. *See* 89 Erie at 169 (Def.s' Ex. 12 [25-14] at p. 9 of 10.) And, once again, each of the challenged articles accurately cites

Judge Bozza's conclusion in his initial dismissal opinion that the underlying incident involved a potential contract violation rather than criminal misconduct. Thus, the articles accurately convey the fundamental point that Plaintiff had been charged with misconduct that was found to be civil, rather than criminal, in nature. Based upon the foregoing, we conclude as a matter of law that the articles in question are substantially accurate in the manner in which they report on Judge Bozza's rulings. Having reviewed the evidence in the light most favorable to Plaintiff, we find that the record cannot support a finding that the fair report privilege was abused.

## IV.  CONCLUSION

Based upon our conclusion that the fair report privilege protects each of the challenged articles, we need not consider Defendants' alternative argument that Plaintiff is a limited purpose public figure who cannot demonstrate that the allegedly defamatory statements were published with malice. We conclude, as a matter of law, that this record does not support a finding that the fair report privilege was abused. Therefore, the Defendants' motion for summary judgment will be granted.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOSEPH E. HUDAK,  )
 )
        Plaintiff,  )      Civil Action No. 06-104 Erie
 )
      v.  )
 )
TIMES PUBLISHING COMPANY,  )
INC., et al.,  )
 )
        Defendants.  )

## ORDER OF JUDGMENT

      And now, *to wit*, this 25th day of January, 2008, for the reasons set forth in the accompanying Memorandum Opinion,

      IT IS HEREBY ORDERED that the Defendants' Motion for Summary Judgment [22] is GRANTED.

      JUDGMENT is hereby entered in favor of Defendants and against Plaintiff, Joseph E. Hudak.

              s/    Sean J. McLaughlin
                 SEAN J. McLAUGHLIN
                 United States District Judge

cm:   All parties of record.